UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

NAFTOMAR SHIPPING AND TRADING CO. LTD.   :
INC.,   :

  :

Plaintiff,   :

  :

- against -   :

  :

D & C ENTERPRISES (PVT) LTD. f/k/a   :
LAUGFS LANKA GAS (PVT) LTD., GAS AUTO   :
LANKA (PVT) LTD.,and LAUGFS HOLDINGS LTD.,   :

  :

Defendants.   :

------------------------------------------------------------X



07 CV 8445 (PAC)

ECF CASE

JAN 1 5 2008

U.S.D.C. S.D. N.Y.
CASHIERS

### SECOND AMENDED VERIFIED COMPLAINT

Plaintiff, NAFTOMAR SHIPPING AND TRADING CO. LTD. INC., (hereafter referred to as "Plaintiff"), by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its Second Amended Verified Complaint against the Defendants, D & C ENTERPRISES (PVT) LTD. f/k/a LAUGFS LANKA GAS (PVT) LTD.[1] ("LLG"), GAS AUTO LANKA (PVT) LTD. ("GAL") and LAUGFS HOLDINGS LTD. ("LH")(collectively referred to as "Defendants") alleges, upon information and belief, as follows:

    1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333.

    2.     Upon information and belief, Plaintiff was, and still is, a foreign corporation, or other business entity, organized under, and existing under the laws of Panama.

    3.     Upon information and belief, Defendants were, and still are, foreign corporations, or other business entities, organized under, and existing under foreign law.

---

[1]     Subsequent to the Agreement and Final Arbitration Award, Defendant LLG changed its name from "Laugfs Lanka Gas (Pvt) Ltd." to "D & C Enterprises (Pvt) Ltd."

4.     On September 17, 2002, Plaintiff and LLG entered into a long term agreement providing for the sale and delivery of a minimum quantity of 20,000 mts of commercial LPG mix (hereinafter "Cargo") by sea.

5.     Pursuant to the contract, the Cargo was to be shipped by sea pursuant to the terms specified therein.

6.     The agreement incorporated the terms of the "Asbatankvoy" charter party form, suitably amended for LPG trade.

7.     Plaintiff, seller, was to be deemed Owner of the nominated vessel under the agreement and LLG, buyer, was to be deemed charterer.

8.     Article 16 of the agreement provided that demurrage was to accrue at $7,200.00 per day.

9.     During the course of the agreement, a dispute arose between the Plaintiff and LLG regarding LLG's failure to pay demurrage and other damages due and owing to Plaintiff under the agreement. *See description of claims in Arbitration Award annexed hereto as Exhibit "1."*

10.    Particularly, during the course of the agreement, LLG refused to receive a shipment of Cargo from Plaintiff, alleging that it was unable to uplift the product.

11.    As a result, in addition to the demurrage owed, Plaintiff incurred loss of profit damages in the amount of $188,680.00.

12.    Due to LLG's breach of the agreement, Plaintiff sustained damages in the total principal amount of $1,047,483.90, exclusive of interest, arbitration costs and attorneys fees.

13.    Pursuant to the agreement, all disputes arising thereunder are to be submitted to arbitration in London with English Law to apply.

14.     Despite due demand, LLG failed to pay the amounts due and owing under the agreement.

15.     As a result, Plaintiff commenced arbitration against LLG on its claims.

16.     On January 26, 2005, an Award was issued in Plaintiff's favor and against LLG. *See Arbitration Award annexed hereto as Exhibit "1."*

17.     The Award found that Plaintiff succeeded on its claim, and directed LLG to pay Plaintiff the principal sum of $1,047,483.90, together with interest thereon, at the rate of 4.5%, compounded quarterly from March 15, 2003 until the date of payment.

18.     The Award further directed that LLG was to pay Plaintiff's costs, which were assessed at £20,048.92 ($40,406.06), together with interest thereon, at the rate of 4.5%, compounded quarterly from March 15, 2003 until the date of payment.

19.     Finally, the Award directed LLG to pay Plaintiff the cost of the Award, together with interest thereon at the rate of 6%, compounded quarterly from the date of payment until date of settlement by LLG.

20.     The cost of the Award was assessed to be £3,480.00 ($7,013.78).

21.     Plaintiff has moved to enforce the Arbitration Award in Sri Lanka and will ultimately obtain a judgment thereon.

22.     Plaintiff requests security herein for the amounts awarded under the Final Arbitration Award and/or the ultimate judgment to be issued upon the Arbitration Award by the Sri Lankan court or any other court where the Arbitration Award is or will be enforced.

23.     As best as can now be estimated, Plaintiff expects to recover the following amounts pursuant to the Final Arbitration Award(s) and/or Judgment(s) entered thereon:

3

| | | | |
|---|---|---|---|
| A. | Principal claim: | | |
| | Demurrage: | | $858,803.90 |
| | Lost profits: | | $188,680.00 |
| B. | Estimated interest on claim: 4.5% interest, compounded quarterly from March 15, 2003 until estimated date of recovery (March 15, 2009) | | $322,951.84 |
| C. | Attorneys' fees and expenses: | | $40,406.06 |
| D. | Estimated interest on attorneys fees: 4.5% interest, compounded quarterly from March 15, 2003until estimated date of recovery (March 15, 2009) | | $12,457.67 |
| E. | Cost of Award: | | $7,013.78 |
| F. | Estimated interest cost of Award: 6.0% interest, compounded quarterly from approx. January 26, 2005 until estimated date of recovery (March 15, 2009) | | $1,957.99 |
| **Total** | | | **$1,432,271.24** |

24.    Upon information and belief, LLG and GAL are two of several companies which are operated, controlled and managed as a single economic enterprise by Defendant "LAUGFS HOLDINGS LTD." which is ultimately controlled by Mr. WKH WEGAPITIYA.

25.    Upon information and belief, Defendant LH uses Defendants LLG and GAL as "pass through" entities such that it can insulate itself from creditors relating to its commercial obligations and in particular its vessel charters/contracts of affreightment.

26.    Upon information and belief, Defendants LLG and GL are shell-corporations through which Defendant LH conducts its business.

27.    Upon information and belief, Defendants LLG and GL have no separate, independent identities from each other and/or Defendant LH.

4

28.    Correspondence regarding the agreement between LLG and Plaintiff was even sent to a GAL e-mail address, namely: gas_auto@slt.net.lk, where GAL had no relationship to the underlying transaction.

29.    LH, LLG and GAL are alter-egos because LH dominates and disregards LLG's and GAL's corporate form to the extent that LH is actually carrying on LLG's and GAL's business and operations as if the same were its own, or vice versa.

30.    Upon information and belief, Defendants LH, LLG and GAL have the exact same address: 7-9, 2nd Floor, Lucky Plaza, Colombo 3, Sri Lanka.

31.    Furthermore, upon information and belief, LH, LLG and GAL have the exact same phone number, fax numbers and general e-mail address (info@laugfs.lk).

32.    In addition, upon information and belief, Defendants LH, LLG and GAL have over-lapping directors.

33.    Upon information and belief, both Mr. WKH WEGAPITIYA and Mr. Da SILVA sit on all three board of directors.

34.    Furthermore, upon information and belief, LH, LLG and GAL utilize the same managers.

35.    Based on the foregoing, as well as other activities, LH, LLG and GAL should be considered as a single economic unit with no corporate distinction between or among them, rendering each liable for the debts of the other, and all assets of LH and GAL susceptible to attachment and/or restraint for the debts of LLG.

36.    By virtue of the foregoing, LH and GAL are properly considered parties to the subject contract and subsequent arbitration award as the alter egos and/or prime movers and controllers of Defendant LLG

37.    In the further alternative, Defendants are partners and/or joint venturers such that LH and GAL are now, or will soon be, holding assets belonging to LLG, or vice versa.

38.    In the further alternative, Defendants are affiliated companies such that Defendants LH and GAL are now, or will soon be, holding assets belonging to LLG, or vice versa.

39.    The Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendants have, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendants.

40.    The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendants held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendants, to compel arbitration and/or to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Amended Complaint failing which default judgment be entered against it;

B.      That pursuant to 9 U.S.C. §§ 201. *et seq.* or the principles of comity this Court recognize and confirm any judgment rendered on the claims had herein as a Judgment of this Court;

C.      That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of $1,432,271.24 belonging to, due or being transferred to, from, or for the benefit of the Defendants, including but not limited to such property as may be held, received or transferred in Defendants' name(s) or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Amended Complaint;

D.      That pursuant to 9 U.S.C. §§ 201 et. seq. this Court recognize and confirm any arbitration award or judgment rendered on the claims had herein as a Judgment of this Court;

E.      That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

F.      That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

7

G.    That the Plaintiff has such other, further and different relief as the Court

may deem just and proper.

Dated: New York, NY
       January 15, 2008

                         The Plaintiff,
                         NAFTOMAR SHIPPING AND
                         TRADING CO. LTD. INC.

                    By: _Nancey_____
                         Patrick F. Lennon
                         Nancy R. Peterson
                         LENNON, MURPHY & LENNON, LLC
                         The Gray Bar Building
                         420 Lexington Ave., Suite 300
                         New York, NY 10170
                         (212) 490-6050
                         facsimile (212) 490-6070
                         nrp@lenmur.com
                         pfl@lenmur.com

8

## ATTORNEY'S VERIFICATION

State of New York   )
                   )    ss.:   City of New York
County of New York  )

1.     My name is Nancy R. Peterson.

2.     I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.     I am an attorney in the firm of Lennon, Murphy & Lennon, LLC attorneys for the

Plaintiff.

4.     I have read the foregoing Amended Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

5.     The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now

within this District.

6.     The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents

and/or representatives of the Plaintiff.

7.     I am authorized to make this Verification on behalf of the Plaintiff.

Dated:     New York, NY
             January 15, 2008

                                  Nancy R. Peterson

9

EXHIBIT "1"

# NAFTOMAR SHIPPING & TRADING CO. LTD, INC.
## -V-
# LAUGFS LANKA GAS (PVT) LTD

## LPG Terms Contract dated 17th September 2002

# FINAL ARBITRATION AWARD

## IN THE MATTER OF THE ARBITRATION ACT 1996

## AND

## IN THE MATTER OF AN ARBITRATION

## BETWEEN

**NAFTOMAR SHIPPING & TRADING CO. LTD. INC.**  Claimants
of Panama                                               (Seller)

## AND

**LAUGFS LANKA GAS (PVT) LTD.**                    Respondents
of Sri Lanka                                            (Buyer)

### LPG Term Contract dated 17ᵗʰ September 2002

### FINAL ARBITRATION AWARD

### WHEREAS:

1.     By an LPG (Liquid Petroleum Gas) Term Contract dated 17ᵗʰ September
2002, the Claimants (hereinafter referred to as the "Sellers") agreed to sell under
the said contract a minimum quantity of 20,000 metric tonnes commercial LPG
mixture to the Respondents (hereinafter referred to as the "Buyers") to be
delivered between October 2002 and March 2003 at a price to be determined by
reference to the Saudi Aramco contract price.

      The product was to be delivered at an average rate of about 4,000 metric
tonnes per month, on the terms and conditions more particularised therein.

*Page 2*

2.    Clause 23 of the LPG Term Contract provided that should disputes arise the same were to be referred to arbitration in London under English Law, in the manner described.

3.    Disputes having arisen under the LPG term contract, the Sellers applied to the High Court in London for an order for the appointment by the Court of a Sole Arbitrator in respect of the disputes between the Sellers and the Buyers under the LPG Term Contract dated 17th September 2002.

By a facsimile message from the London solicitors acting on behalf of the Sellers, I received the order of Mr. Justice Tomlinson from the High Court of Justice, Queens Bench Division, Commercial Court dated 12th March 2004 confirming that the Court had appointed me, the undersigned William Robertson of The Atlas Room, 37 Woodpecker Crescent, Burgess Hill, West Sussex, RH15 9XY, as Sole Arbitrator in the reference. By a facsimile message of 27th March 2004, I duly accepted appointment as Sole Arbitrator in the reference, in accordance with the Court's order, and I notified the parties of my acceptance that day.

Under cover of a facsimile message of 26th October 2004 and the same letter in hard copy, I received the Sellers' claims submissions, together with supporting documentation.

I made an order for directions on 29th October 2004 that the Respondent Buyers, Laugfs Lanka Gas (Pvt) Ltd., serve appropriate defence submissions by latest close of business Monday 22nd November 2004.

As I heard nothing by way of a response from the Buyers and as they were in default of my order for service of defence submissions, I made a further order on 23rd November 2004, in final and peremptory terms, for service of the Buyers' defence, together with any counterclaim and supporting documentation, by latest 30th November 2004. Nothing was heard from the Buyers and, accordingly, on 2nd December 2004 I informed the parties that I was proceeding to my Award in the reference.

*Page 3*

In the light of the steps that have been taken, I have considered that the Buyers have been given every opportunity to participate in the procedure of this arbitration and have failed to do so. In the circumstances, I have considered it appropriate to proceed to my Final Award in the reference.

4.    The seat of the arbitration is London, England.

5.    The disputes referred to the undersigned concerned claims made by the Sellers in respect of demurrage, or alternatively damages, in a sum of US $858,803.90 and damages for loss of profits in a sum of US $118,680.00; together with interest and costs.

The Sellers also sought a declaration that Clause 25 of the LPG contract constituted a valid agreement to arbitrate.

6.    I received written submissions, together with full supporting documentation, from the London solicitors acting on behalf of the Sellers. They were content that I proceed to an Award on the basis of the written submissions alone without an oral attended hearing. The Sellers requested a Reasoned Award and accordingly these Reasons are annexed hereto and form part of this my Final Arbitration Award.

NOW I, the said William Robertson, having taken upon myself the burden of Sole Arbitrator in relation to the disputes between the parties, and having read the written submissions and documents produced to me, and having weighed and considered the facts and the evidence, **DO HEREBY MAKE, ISSUE AND PUBLISH** this my **FINAL ARBITRATION AWARD** as follows:

**I FIND AND HOLD** that the Sellers' claims in respect of demurrage and damages for loss of profit, succeed in full in the respective sums of US $858,803.90 and US $188,680.00, making a total of US $1,047,483.90.

*Page 4*

I HEREBY DECLARE that Clause 25 of the LPG Term Contract dated 17th September 2002 constitutes a valid agreement to arbitrate.

I AWARD AND ADJUDGE that the Buyers shall forthwith pay to the Sellers the sum of US $1,047,483.90 (One Million, Forty-Seven Thousand, Four Hundred & Eighty-Three United States Dollars and Ninety Cents), together with interest thereon at a commercial rate of 4.5% per annum, compounded at three monthly intervals, from 15th March 2003 until the date of payment by the Buyers.

I FURTHER AWARD AND ADJUDGE that the Buyers shall bear and pay their own and the Sellers' recoverable costs of the reference and that the Buyers shall bear and pay the cost of this my FINAL AWARD, which I HEREBY DETERMINE in the sum of £3,480.00, inclusive of my fees and interlocutory charges.

I HEREWITH DETERMINE AND SETTLE the Sellers' costs of the reference in a total sum of £20,048.92.

I ADDITIONALLY AWARD AND ADJUDGE that the Buyers shall forthwith pay to the Owners the sum of £20,048.92 (Twenty Thousand & Forty-Eight Pounds Sterling and Ninety-Two Pence), together with interest thereon at a rate of 4.5% per annum, compounded at three monthly intervals, from the date of this Award until the date of payment by the Buyers.

ALWAYS PROVIDED that if the Sellers have in the first instance paid any sum in respect of the cost of this Award, they shall be entitled to immediate reimbursement from the Buyers of the sum so paid, together with interest thereon

*Page 5*

at a rate of 6% per annum, compounded at three monthly intervals, from the date of payment of such sum by the Sellers until the date of settlement by the Buyers.

**GIVEN** under my hand in London                     26ᵗʰ January 2005

WILLIAM ROBERTSON                     WITNESS

## NAFTOMAR SHIPPING & TRADING CO. LTD. INC.
### of Panama
### -v-
## LAUGFS LANKA GAS (PVT) LIMITED of Sri Lanka

### LPG Terms Contract Dated 17th September 2002

## REASONS FOR AND FORMING PART OF THE
## ARBITRATOR'S FINAL AWARD

1)      By an LPG Terms Contract dated 17th September 2002, the Sellers
agreed to sell and the Buyers agreed to purchase a minimum quantity of 20,000
metric tonnes commercial LPG mixture over a period of time between October
2002 and March 2003. It was agreed between the parties that the price was to be
determined by reference to the Saudi Aramco contract price, a copy of which was
served in evidence in these arbitration proceedings.

The product was to be delivered by the Sellers at an average rate of
about 4,000 metric tonnes per month, whereby the Buyers guaranteed to accept a
minimum quantity purchase of 1,000 metric tonnes during October 2002 and a
quantity of 4,000 metric tonnes for each month thereafter, i.e. November 2002
onwards. It was agreed that the Buyers intended initially to receive the product in
lot sizes of about 500 metric tonnes.

2)      The Sellers claimed demurrage in this arbitration, or, in the alternative,
damages, in a sum of US $58,805.98, together with loss of profits in a sum of US
$158,680.00, together with interest and costs.

3)      The LPG Terms Contract provided, inter-alia, as follows:

### Clause 3

### Period:

"*From October 2002 thru March 2003 – extension may be
agreed by mutual consent.*"

*Page 2*

### Clause 5

### Quantity:

*"Minimum 20,000mt delivered at an average rate of about 4,000mt per month.*

*Buyer guarantees minimum quantity purchased*

| | |
|---|---|
| *1,000mt* | *during October 2002* |
| *4,000mt* | *each month November 2002 onwards* |

*Initially Buyer intends to receive product in lot sizes of about 500mt."*

### Clause 8

### Delivery:

*"D.E.S off Colombo by its into Buyers' vessel. Buyers have option to take delivery at ISP / ISB Colombo or ISP / ISB Galle, Sri Lanka.*

*All port charges are always for Buyers' account.*

### Clause 9

### Price:

*"Price shall be based on the Saudi Aramco contract price / CP) applicable on B/L date (or transhipment B/L date)*

*For butane and propane plus US $75.*

*For the purpose of calculating the applicable CP, the quantity of C3s and lighters shall be deemed to be propane and C4s and heavier compounds shall be deemed to be butane, basis certificate of quantity."*

*Page 3*

## Clause 15

### Laytime:

*"When Buyer fails to receive minimum quantity agreed, then laytime used, in excess of 30 days each month, shall count towards demurrage incurred.*

*Laytime to count from the time of vessel berthing or 6 hours after vessel tenders notice of readiness upon her arrival at outer anchorage, whichever occurs first."*

## Clause 16

### Demurrage:

*"USD 7200 per day pro rata*

*In principle, demurrage payment shall be due on the 30th day following each delivery."*

4)    Sellers' Submissions

The Sellers explained that deliveries under the LPG contract had commenced in October 2002, when the Buyer lifted 1,512.777 metric tonnes of product, in compliance with the minimum quantity agreed in the contract for October.

They said that Clause 5 of the LPG contract required a minimum of 1,000 metric tonnes to be lifted in October and thereafter a monthly minimum of 4,000 metric tonnes.

It transpired, however, that the subsequent series of liftings from November 2002 through to February 2003 were all short of the monthly minimum requirement under the terms of the contract of 4,000 metric tonnes per month.

---

*Page 5*

*Under these persistent and extraordinary circumstances, which do not show any signs of mitigating in the foreseeable future, we feel that at present "Gaz Fidelity" may be withdrawn immediately (w.e.f. 1ˢᵗ March 2003). We confirm that we have purchased all the possible quantities only from Naftomar, but due to the extraordinarily adverse factors emerging post signing of our term contract, the quantities uplifted have not been in line, due reasons beyond our control. We will reinstate the contract as soon as conditions become normal.*

*Meanwhile we thank you for your understanding of the situation and your support. We request for a favourable and pragmatic consideration of the demurrage implications as requested earlier. We will be visiting Athens shortly to discuss the matter with you. We are committed to Naftomar for our future requirements and assure you that we would like to maintain a long term association with you. However we would call upon your active assistance and pragmatic support during the prevailing circumstances, which have actually been out of our direct control.*

*Thanking you,*
*Your sincerely,*
*LAUGFS LANKA GAS (PVT) LIMITED*


*W.K.H. WEGAPITYA*
*Chairman*

*C.C.  Capt. Likhari – India*
*Mr. D.S. Baves – India"*


The Sellers pointed out that at this stage there remained on board the vessel, "Gaz Fidelity", a quantity of 3,560 metric tonnes LPG, which had been allocated for delivery to the Buyers in March 2003, in accordance with the ullage report and soundings survey, both of which were dated 26ᵗʰ February 2003 and

Page 6

copies of which were served in evidence. These quantities were also confirmed by a telex from the Master of 28th March 2003 addressed to the Sellers.

In a further e-mail of 12th March 2003, the Buyer clarified to the Seller that they "... had not declared "force majeure".

The Sellers submitted that, bearing in mind 3,560 metric tonnes LPG remained on board the vessel allocated for delivery to the Buyer, they had advised the Buyer by e-mail on 21st March 2003 that they were "... waiting for [the Buyers'] agreement to sail the vessel from Colombo... [in the hope]... that an acceptable agreement will be reached by Monday 24/3 thereafter vessel can sail".

The Buyer had responded by e-mail on 24th March advising that, "... there are no immediate possibilities for further discharging of product from "Gaz Fidelity"... we suggest you may divert the vessel if required".

All these e-mail exchanges were served in evidence and, consequently, on 25th March 2003 at 0318 hours the "Gaz Fidelity" departed from Colombo with 3,560 metric tonnes LPG still in the tanks.

As a consequence of these developments, the Sellers claimed from the Buyers, by way of e-mail dated 2nd April 2003, various sums in respect of demurrage that had been incurred between November 2002 and March 2003. They also claimed a loss due to a drop in the market (Saudi Aramco CP) value of the LPG retained on board the "Gaz Fidelity" between March 2003 and April 2003.

The total sum claimed amounted to US $1,052,291.20, which is detailed below, however, due to an error this was reduced to US $1,047,483.90.

5)    **Demurrage**

Pursuant to Clauses 15 & 16 of the LPG Contract, the Sellers contended that from November 2003 onwards any monthly liftings that fell short of the

*Page 7*

guaranteed minimum quantity of 4,000 metric tonnes per month were to count towards demurrage.

The Sellers submitted there were 9 liftings in total from October 2002 through to February 2003, as evidenced by reference to invoices served in evidence. These liftings were as follows:

1. 23rd October 2002:       504.267 metric tonnes;
2. 26th October 2002:       502.379 metric tonnes;
3. 31st October 2002:       506.131 metric tonnes;
4. 16th November 2002:      500.068 metric tonnes;
5. 6th December 2002:       500.654 metric tonnes;
6. 18th December 2002:      500.922 metric tonnes;
7. 30th December 2002:      500.873 metric tonnes;
8. 14th January 2003:       498.592 metric tonnes;
9. 13th February 2003:      500.080 metric tonnes.

The Sellers made the point that in respect of the demurrage calculations the quantity lifted on 31st October 2002 was to be treated as having been lifted in November 2002, given that the earlier two October liftings had already exceeded the minimum lift requirements for the month by an amount of 6.646 metric tonnes.

The Sellers made reference to the fact that the monthly demurrage rate for the relevant period was US $7,200 multiplied by 30.4, which was established by 365 days divided by 12 months and equated to US $218,880.

The demurrage due to shortliftings was incurred up until the "Gaz Fidelity" departed Colombo at 0810 hours on 25th March 2003 and is calculated by multiplying the monthly demurrage rate by each of the amounts by which the Buyer fell short of the guaranteed monthly lift of 4,000 metric tonnes. This is set out as follows:

| Month | Mts short of 4,000 | % of 4,000 | Demurrage(US$) (shortlift % x $218,880) |
|---|---|---|---|

*Page 8*

| | | | |
|---|---|---|---|
| 31 Oct/Nov 02 | 2,953,781 | 74.85 | 169,831.62 |
| Dec 02 | 2,497,571 | 62.44 | 136,668.67 |
| Jan 03 | 3,501,408 | 87.54 | 197,607.55 |
| Feb 03 | 3,500 | 87.5 | 191,520.80 |
| Mar 03 | 3,201.316 | 80.033 | 175,176.00 |

**Total Demurrage:**                      **US$858,103.98**

Based upon these calculations, the Sellers claimed a total amount of demurrage of US $858,803.96 due to successive monthly shortliftings.

In support of their claim for outstanding demurrage, the Sellers referred to the letter from Laugfs Lanka Gas (Pvt) Ltd. of 28th February 2003, referred to earlier in these Reasons, where the buyer acknowledged their liability in principle for the outstanding demurrage.

6)    **Loss Due to Drop in Market Value of LPG**

The Sellers advised that the remaining LPG, having been blended, was subsequently sold to Shell Gas Lanka Ltd. in Sri Lanka in a total quantity of 3,885 metric tonnes at the Saudi Aramco CP April 2003 unit price of US $314.50 per metric tonne. The Sellers said this was based on a 30/70 propane / butane ratio.

The Sellers served in evidence their telex invoice and letter of undertaking, both dated 15th April 2003, as well as a fax from Saudi Aramco dated 30th March 2003 setting out the Saudi Aramco LPG prices for April 2003.

The Sellers submitted that in March 2003 the Saudi Aramco CP for propane and butane had been US $385 per metric tonne and US $360 per metric tonne respectively. This equated to a unit price, based on the same 30/70 ratio, of US $367.50 per metric tonne. A copy of a fax from Saudi Aramco to the Seller of 26th February 2003 was submitted.

Page 9

The Sellers referred to the April 2003 unit price, which had fallen to US $314.50 per metric tonne and this represented a fall in the unit price of US $53 per metric tonne between March and April 2003.

When this is applied to the quantity of LPG remaining on the "Gaz Fidelity" of 3,560 metric tonnes, the fall in the unit price equated to a loss on the part of the Seller of US 188,680.00, which they claimed from the Buyer due to the breach of contract.

7)    There is incontrovertible evidence in the letter of Laughs Lanka Gas (Pvt) Ltd. of 28th February 2003, quoted in these Reasons on pages 4 and 5, accepting liability for the demurrage incurred.

Indeed, that letter from Mr. Wegapitya, the Chairman of Laugfs Lanka Gas (Pvt) Ltd. referred to earlier discussions and correspondence on the same subject.

The letter made is abundantly clear that, due to the circumstances described by the Buyers, they were, in effect, reneging on the agreement to accept delivery of product, pursuant to the LPG Term Contract itself.

It is clear from the failure of the Buyers to accept the product on the nominated vessel, "Gaz Fidelity", and the fact that the series of liftings from November 2002 through to February 2003, as provided in the contract, all fell short of the minimum monthly quantities, amounted to a serious breach of their contractual obligations by the Buyers.

The LPG Contract at Clause 5 clearly stipulates that the minimum quantity the Buyers agreed to accept over the referred period was a minimum of 20,000 metric tonnes to be delivered to them at an average rate of 4,000 metric tonnes per month. This is in addition to the Buyers' guaranteed minimum quantity purchase of 1,600 metric tonnes during October 2002 with the stipulation that each month thereafter 4,000 metric tonnes was to be accepted.

*Page 19*

It is clear from the evidence that the Buyers failed to lift the required quantities and indeed, from their comments outlined in the correspondence, they had no intention of lifting those quantities for the reasons given.

I, therefore, find that the Sellers are entitled to the demurrage they seek following the Buyers' breach of contract. This is supported by the inference to be drawn from the words used by Mr. Wegapitya in his letter to the Sellers of 28th February in relation to the following extracts:

> "...we confirm that we have purchased all the possible
> quantities only from Nafenner, but due to the extraordinarily
> adverse factors emerging post signing our term contract, the
> quantities uplifted have not been in line, due to reasons beyond
> our control. We will reinstate the contract as soon as
> conditions become normal. Meanwhile, we thank you for your
> understanding of the situation and your support. We request
> for a favourable and pragmatic consideration of the demurrage
> implications as requested earlier..."

It is clear from what Mr. Wegapitya had to say that the Buyers were well aware of their responsibilities under the LPG Term Contract and must, as a consequence, be responsible to the Sellers for demurrage.

With regard to the Sellers' demurrage calculations, these are well supported by appropriate documentation and I have accepted as accurate the figures put forward by the Sellers with regard to the monthly liftings, which fell short of the guaranteed minimum quantities of 4,000 metric tonnes per month, pursuant to the terms of the contract.

The calculations of demurrage, based on the demurrage rate in the contract of US $7,200 per day pro rata, are approved and I find unhesitatingly that the Sellers' claim for outstanding demurrage of US $858,893.90 succeeds in full.

*Page 11*

8)     I turn now to the Sellers' claim in respect of the loss suffered by them due to the drop in the market value of LPG during the period the product was on board the "Gaz Fidelity", whereby a quantity of cargo of 3,560 metric tonnes LPG was left on board.

The Buyers had made it abundantly clear in correspondence that there was no possibility of them accepting discharge of product from the "Gaz Fidelity". I refer in particular to an e-mail message from Mr. Wegapitiya to the Sellers of 24th March 2003, which provided, inter-alia, as follows:

*"To:*

*Capt. D. Singh*

*NAFTOMAR SHIPPING AND TRADING LTD. INC. PANAMA*

*243, Alkyondian Ave,*

*GR16573, Voula,*

*Athens,*

*GREECE*

*Dear Capt. Singh,*

*Our Ref: LPG 012*

*Refer our telecon, as mentioned despite our various efforts there are no immediate possibilities for further discharging of product from "Gaz Fidelity", as conditions remain unchanged from position advised earlier. We suggest you may divert the vessel if required. As regards to the pending issues, we will discuss the details during our visit to Athens on 2nd April, as informed.*

*Thanking you,*

*Yours sincerely,*

*W.K.R. WEGAPITIYA*

*Chairman*

*Page 12*

*Laugfs Lanka Gas (Pvt) Ltd "*

As a consequence, there was, in effect, an admitted breach by the Buyers of their contractual obligations, in respect of which the Sellers had no choice but to take action by way of mitigation to reduce the loss they were suffering.

The Sellers undertook to sell the quantity of LPG on board the "Gaz Fidelity" to Shell Gas Lanka Ltd. but, because of the fall in market value, they suffered a loss equating to US $158,680.00.

The calculations of the Sellers are accurate and, therefore, I have concluded that the Buyers must pay to the Sellers the sum of US $188,680.00 by way of damages due to the drop in market value of the LPG left on board the "Gaz Fidelity" as a consequence of their breach of contract and I so find.

9)    In summary, therefore, the Sellers are successful in their claims in respect of demurrage and damages for loss of profits in a total sum of US $1,047,483.50.

10)    **Jurisdiction**

The Sellers sought a declaration that Clause 25 of the LPG Term Contract dated 17th September 2002 constituted a valid agreement to arbitrate.

The Sellers explained that during the period April to July 2003 unsuccessful attempts were made to resolve these matters with the Buyers on an amicable basis.

Since that time, requests have been made for payment and also in relation to the commencement of arbitration proceedings.

It transpires that the Buyers instructed DL&F de Saram of Sri Lanka to deny liability for the losses suffered by the Sellers, despite the Sellers' earlier acknowledgement of liability, and subsequently, in a letter of 2nd December 2003, they questioned the validity of the arbitration agreement contained in Clause 25 of the LPG Term Contract.    :

*Page 13*

The London solicitors acting for the Sellers responded on 12th December 2003, explaining that under English law, which was the governing law, and also by Clause 25 there was ample authority in support of the validity of such abbreviated agreements to arbitrate. Following that exchange, nothing further was heard from either the Buyer or DL&F de Saram, on behalf of the Buyer.

Clause 25 of the LPG Term Contract states:

*"Law: English law / arbitration London"*

The Sellers referred to Article 6 of the Arbitration Act 1996, which defined an "arbitration agreement" as meaning:

*"...an agreement to submit to arbitration present or future disputes (whether they are contractual or not)"*

The Sellers submitted that in the context of abbreviated agreements such as in this case, the English courts have leaned against frustrating the intention of the parties and will generally try to give the clause in question a meaning. This has meant interpreting as certain and valid such clauses as "arbitration to be settled in London", "arbitration in London" and "and arbitration". Indeed, they said that every single word "arbitration" has been accepted as being sufficiently certain.

The Sellers also made reference to Article 30(1)(a) of the Arbitration Act 1996 to the extent that the Tribunal is competent to rule on its own jurisdiction and specifically on the question of whether there is a valid arbitration agreement.

11)   The terminology used in Clause 25 of the LPG Term Contract is clear and unambiguous. The phraseology used clearly incorporates into the terms of the contract the law of the contract, i.e. English law, and the fact that should any disputes arise they should be referred to arbitration in London to a Sole Arbitrator, unless the parties agree to appoint an arbitrator of their choice.

*Page 14*

The reference to arbitration in London is unambiguous to the extent that it brings to the contract the settlement of disputes by way of arbitration in London. I have no hesitation therefore in making a declaration that Clause 25 of the LPG Term Contract does constitute a valid arbitration agreement under English law.

It is clear from the contemporaneous documentation served in evidence by the Sellers and in particular the exchanges with the Buyers and lawyers DL&F de Saram, acting on behalf of the Buyers, that the Buyers were given every opportunity to agree the appointment of a Sole Arbitrator, pursuant to the terms and conditions of the Arbitration Act 1996.

These exchanges came to nothing, regrettably, and, as is fully outlined in my Award, the Sellers made application to the High Court of Justice in London for the appointment of a Sole Arbitrator in this arbitration reference.

The order of Mr. Justice Tomlinson from the High Court of Justice, Queen's Bench Division, Commercial Court, dated 12th March 2004 confirming my appointment as Sole Arbitrator in the reference was subsequently received and notified to the Buyers.

12)    The Sellers, having been successful in their claims are entitled to interest on the sum found due of US $1,047,433.90, which I have awarded at a commercial rate of 4.5% per annum, compounded at three monthly intervals, from 13th March 2003 until the date of payment by the Buyers.

13)    The Sellers are also entitled to their costs of the reference, which follow the event in the normal manner.

I received under cover of a facsimile message of 7 December 2004 a schedule of the Sellers' costs of the reference with a request that, in the event I was minded to make an Award in favour of the Claimants, I take into account the attached statement of costs for these to be determined, which I now do following the Sellers' success in their claims.

Page 15

14)    In considering the costs submitted to me for determination, I have applied the general principle that the costs must be reasonably and properly incurred, as well as taking into consideration appropriate market rates for London maritime solicitors for the periods in question and, of course, the nature and complexity of the case itself.

The total sum claimed by the Sellers in respect of their costs of the reference amounted to £20,048.92, which comprised their solicitor profit costs of £19,978.00 and disbursements of £70.92.

The charging rates set out in the schedule, as claimed by the Sellers, included a rate of £280 per hour for a Partner and other rates of £210 per hour for a senior solicitor and £170 per hour for a less experienced solicitor.

I have considered the charging rates in this case, which I have considered to be appropriate market rates for the period in question and herewith approve those charging rates, by both the Partner and the solicitors, as being fair and reasonable.

15)    The overall time spent in preparation and resolution of the issues in this case, leading to the publication of my Final Award, totalled some 94 hours of the collective time of the Partner and other solicitors.

I have considered overall the case in general and its complexity and am satisfied that the time spent, both by the Partner, the senior solicitor and the lesser experienced solicitor, was fair and reasonable in the circumstances.

I have considered the time spent, including the time spent on attendances, to be fair and reasonable and have accordingly allowed the Sellers' claimed profit costs of £19,978.00 in full.

16)    With regard to the disbursements claimed in this case, these amounted to £70.92 in respect of photocopying charges. This is a perfectly normal expense in relation to a case in London arbitration proceedings and I have accordingly allowed the disbursements as being fair and reasonable.

*Page 16*

17)     To summarise the position, I have determined the costs claimed by the Sellers in respect of their costs of the reference as being fair and reasonable and have allowed these costs in full in the total sum of £20,048.92.

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

BETWEEN

NAFTOMAR SHIPPING & TRADING CO. LTD. INC.
of Panama

Claimants
(Seller)

AND

LAUGFS LANKA GAS (PVT) LTD
of Sri Lanka

Respondents
(Buyer)

LPG Term Contract dated
17th September 2002

FINAL ARBITRATION AWARD

## Nancy R. Siegel

| | |
|---|---|
| From: | NYSD_ECF_Pool@nysd.uscourts.gov |
| Sent: | Friday, January 11, 2008 2:20 PM |
| To: | deadmail@nysd.uscourts.gov |
| Subject: | Activity in Case 1:07-cv-08445-PAC Naftomar Shipping and Trading Co. Ltd., Inc. v. D & C Enterprises (Pvt) Ltd. Endorsed Letter |

This is an automatic e-mail message generated by the CM/ECF system. Please **DO NOT RESPOND** to this e-mail because the mail box is unattended.
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing.

### U.S. District Court

### United States District Court for the Southern District of New York

### Notice of Electronic Filing

The following transaction was entered on 1/11/2008 at 2:19 PM EST and filed on 1/11/2008
**Case Name:** Naftomar Shipping and Trading Co. Ltd., Inc. v. D & C Enterprises (Pvt) Ltd.
**Case Number:** 1:07-cv-8445
**Filer:**
**Document Number:** 11

**Docket Text:**
**ENDORSED LETTER addressed to Judge Paul A. Crotty from Nancy Siegel dated 1/10/08 re: Request that plaintiff be permitted to file a Second Amended Complaint, adding two new defendants. ENDORSEMENT: So ordered. (Signed by Judge Paul A. Crotty on 1/11/08) (cd)**

**1:07-cv-8445 Notice has been electronically mailed to:**

Patrick F. Lennon  pfl@lenmur.com

Richard Joseph Reisert  reisert@navlaw.com

Nancy Rebecca Peterson  nrp@lenmur.com

**1:07-cv-8445 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1008691343 [Date=1/11/2008] [FileNumber=4159457-0

1

] [8dc836dc8ace090d96503e76391b6e979d2d5a95a5d3cf2e12d34b7413b9ba7db5d
67f9745ac61ecccf4f70c352232299659b8a10dbd6901de8dbe67e1ddb2d0]]